**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                                **No.  3:12-cr-30271-DRH**

**ALLEN J. TEAGUE,**

       **Defendant.**

**<u>SENTENCING MEMORANDUM</u>**

**HERNDON, Chief Judge:**

**I.     THE SENTENCING HEARING**

The Court held a sentencing hearing on September 6, 2013, with the defendant and counsel for both parties present.  This memorandum represents what sentence the Court intends to impose, unless further comment by the parties alters the Court's intentions, and, therefore, does not in any way represent the final order of the Court.

The findings of the probation officer in the presentence report were adopted by the Court following arguments of counsel relative to objections filed by the defendant.  The defendant's objections were three-fold: that an enhancement to the offense level for obstruction of justice should not apply, that the offense level should be reduced for acceptance of responsibility, and that the Court should not apply the career criminal enhancement because the criminal history points over

represent the defendant's true criminal history and he should not, therefore, qualify for the enhancement in the first place.

The Court made a more detailed analysis on the record, which it incorporates by reference here.   The essence of that finding was that the defendant directly, and through another, tried to influence and intimidate a witness with the goal of keeping the witness from testifying against him.  He did so over the telephone and through another person by certain actions having to do with the custody of a child in the care of that witness.   The defendant thereby earned an obstruction of justice enhancement as advised by the language of Section 3C1.1 of the Guideline Manual of the United States Sentencing Commission.

Complimentary to that enhancement is the Commission's advice that conduct which amounts to obstruction of justice and results in an enhancement ordinarily indicates that the defendant has not accepted responsibility, as defined and used in the guidelines, unless some extraordinary circumstance exists to demonstrate otherwise.  Once again, the Court adopts his in-court analysis herein by reference.  The core of that analysis was that attempting to adversely influence and intimidate a government witness is the quintessential example of failure to accept responsibility.   His later plea represents more a resignation of circumstance than acceptance of responsibility.

As for the career offender treatment, it is apparent that the defendant is technically and clearly qualified for the adjustment under Chapter Four of the

Guidelines.   The predicate offenses were present and he qualified for the application as a guideline enhancement.   The Court has the discretion and will pursue a thorough analysis under the statutory factors regarding the propriety of applying that treatment to this defendant as an individualized sentence.   In so doing, the Court will consider the entire record it must consider when imposing a sentence.   However, in order to properly and accurately calculate the Guideline treatment, and therefore determine the accurate advice from the Sentencing Commission to this Court, the Career Offender status must be applied to this defendant in the first instance.

After making the above determinations, the Court made findings regarding the complete guideline computation.   The defendant's guideline calculation was a total offense level 34 and a criminal history category VI; resulting in a custodial range of 262 months to 327 months, at least 6 years of supervised release, and a fine range of $17,500.00 to $4,000,000.00 plus the special assessment of $200.00.   The Court then went over the statutory factors found in 18 U.S.C. § 3553(a) and the parties made widely divergent arguments relative to how each believed the Court should interpret those factors in this case.   Upon invitation, the defendant also addressed the Court in allocution.

## II.    THE FACTS

In July of 2012, a confidential source (CS) informed officers of the Alton Police Department that he/she had known Allen Teague for a period of one to two months and had made five or six purchases of crack cocaine from him.   The CS

made two controlled purchases on behalf of law enforcement, one a $50 purchase (although Teague gave him/her more than requested as recompense for money owed the CS by an "acquaintance" of defendant's) and a $60 purchase. Teague's cousin, who was with him at the time of his arrest, told police that she had seen him sell crack 75 to 100 times and the amounts were typically $20 to $100. The defendant admitted selling crack and claimed his typical sales were $20 to $30.

The balance of the facts will be discussed at the relevant parts of this memorandum.

## III.    STATUTORY ANALYSIS

The Court, in fulfilling its remaining obligation to the defendant and the public, must examine the factors contained in 18 U.S.C. § 3553(a).

A. <u>The Nature And Circumstances Of The Offense</u>

Dealing drugs is a serious crime. In this case it was crack cocaine. The defendant made a few controlled buys to a confidential informant.

The government emphasized that the frequency of the defendant's dealing is significant despite that fact that each sale was small. The prosecutor points to the fact that defendant sold crack cocaine twice in a matter of a few days, demonstrating, according to the government, that defendant was not an occasional dealer, but rather a frequent, repeat dealer.

The defense argues that the defendant is a low level street dealer who dealt in small amounts of drugs and never made any money doing so. The defendant also asserts that while he is subject to a term of incarceration, the incarceration

called for by the advice of the Commission, with the career criminal aspect included, is far too great for this particular defendant.

The Court agrees that the facts and circumstances of this case, as well as defendant's criminal history, demonstrate that the defendant is a low level street dealer.  Dealing crack cocaine or any controlled substance illegally is a serious crime because of the dangers and economic havoc caused by addiction and unregulated use.  This judge has presided over so many cases originating from the community where this defendant was distributing drugs that he knows only too well the horrible effects illegal drugs have had on that community.

B. <u>The History And Characteristics Of The Defendant</u>

The defendant has sufficient criminal history to warrant a finding by the Court, under the guideline system and the advice from the Guideline Commission, that he be categorized, labeled if you will, a "Carrier Offender."   So a recapitulation of his past conduct is in order.

At the age of 13 the defendant committed arson and received 2 years probation but no guideline points. His probation was revoked twice, resulting in extensions of his supervision twice and, ultimately, in a commitment to the juvenile division of the Department of Corrections.

In a separate but parallel arson case, Mr. Teague was sentenced to two years of probation and received no guideline points.  His post judgment issues tracked those of the first offense described above.

At the age of 14, while in the group home for the arson crimes mentioned

heretofore, the defendant and another juvenile stole a vehicle from the group home, and were later involved in an accident. For the conviction of the crime of receiving stolen property, Mr. Teague was sentenced to probation until his 18th birthday. He is assessed no guideline points for our present considerations. This was the subject of the previously described first petition to revoke.

While these three crimes are serious crimes committed by a youthful offender, society generally, and this judge as well, does not often place much weight in assessing a defendant's propensity for adult criminal behavior by carefully examining his juvenile record. A truly careful analysis would undoubtedly require an equally careful examination of the youth's home life and structure, including the nature and philosophy of discipline imposed there, and the philosophy of how one is to view authority, both persons and institutions. Such an examination would reveal whether the youthful offender had adult guidance or none, whether his actions went against the teachings of his adult role models or was consistent with it, whether the young person was being taught to respect authority or reject it, among other behavioral keystones. This record does provide the Court with information that affords the Court the ability to conduct that kind of analysis.

The record does provide some insight that bears some discussion. The defendant's biological father was a murder victim when the defendant was only 4 years of age. From age of 6 to 9, the defendant's mother dated and later married a man who was a drug addicted alcoholic. He was abusive to everyone in the

house, including physically abusive, despite his paralysis from the waist down due to a gun shot wound.  His stepfather died while the defendant was 15, shortly after he began committing the crimes described above.

There is nothing that scientifically or medically establishes a cause and effect between his father's tragic death or the physical abuse suffered at the hands of his stepfather and the defendant's early criminal behavioral issues.  The defendant's mother insists that as a youngster he was diagnosed as being bipolar and a schizophrenic, though this is unconfirmed and she could not recall the medication he was prescribed.  The defendant recalls being psychiatrically evaluated during an incarceration in 2005, but does not believe he received a diagnosis nor receive a prescription for medication.

Therefore, the Court places little weight on the juvenile convictions of the defendant.  It does not, however, disregard them.  The Court acknowledges that they represent a troubled youth with little guidance, discipline and proper structure who for whatever reason was acting out in a manner that was a danger to his community.

The defendant did not waste much time after his release from Department of Corrections for his juvenile matters, at age 17, to begin his adult criminal activities.  In August of 2000, he teamed up with his uncle, Robert Teague, to commit an armed robbery of a bread store.  His uncle brandished a gun he got from the defendant, ordered people around, and grabbed the cash, while the defendant stood at the door, both of them wearing masks of some sort.  The plan

did not work out so well, they were caught the same day.  The defendant was sentenced to 10 years in prison (3 guideline points for our calculation) and was paroled after 4 years.

Defendant violated parole for unlawful possession of crack and was sentenced to 30 months in prison (another 3 guideline points for our purposes. He was once again paroled after serving a fraction of the time; a little over a year in this instance.

Two and a half years later, and after successfully completing his parole terms this time, the defendant was arrested for unlawful delivery of crack.  While the arrest transaction occurred within 1000 feet of a public park, he pled guilty to an amended offense.   The CS informed officers that he/she had previously purchased crack cocaine from the defendant over 10 times.  The defendant was sentenced to 42 months in prison (3 guideline points for our calculation) and once again paroled within a year and an half after incarceration.  The defendant was still on this parole when he committed the repeat offense of distribution of crack cocaine which is subject of the case at bar.

Moreover, his last conviction was the subject of the government's notice of information charging prior offense for the purpose of putting the defendant on notice of enhanced sentencing exposure pursuant to Title 21, United States Code, Sections 841, 850 and 851.  The defendant did not object to this conviction, and admitted that he was so convicted.  He is therefore subject to an enhancement of certain sentencing maximums as follows: the maximum statutory term goes from

20 years to 30; the maximum fine from up to $1 million to up to $2 million and supervised release from not less than 3 years to not less than 6 years.

In addition to qualifying for this enhancement, the defendant also qualifies for the classification, according to the Sentencing Commission, of a Career Offender.  In Mr. Teague's case, this is significant because his offense level would increase from a 20 to a 34.  The Court's further determination that he did not qualify for the adjustment for acceptance of responsibility, due to his actions in tampering with and attempting to intimidate a witness, means that the offense level would stay at a level 34.  His criminal history category would, however, go up by one level, from a V to a VI with the career label.

At the sentencing hearing, there was vigorous argument regarding the guideline calculation in this case.  Ultimately the Court found that the correct calculation and application of the guideline manual included an enhancement for obstruction of justice, as heretofore mentioned, no reduction for acceptance of responsibility in correspondence with that same conduct, and the simple application of the career offender treatment based on past qualifying convictions.

However, the Court has the authority to decide whether the imposition of a sentence that applies the career offender classification is sound reasoning and a true reflection of this defendant.  Given that the bulk of the Commission's advice regarding the defendant's sentence is from the career offender classification, the Court could also simply reject the advice of the Commission generally as not appropriate.  All the Court must do is verbalize the logic behind its reasons for its

conclusion.

Perhaps the most vigorous debate at sentencing was focused on the issue of whether the Court should impose the full weight of the advice from the Commission relative to the career offender classification.

C. The Need For The Sentence Imposed To Reflect Seriousness Of The Offense, To Promote Respect For The Law, To Provide Just Punishment For The Offense.

The defendant argues, in his memorandum and at the hearing, that the case of *US v. Newhouse*, 919 F. Supp. 2d 955 (N.D. Iowa 2013 Bennett, J.) should apply here. In that case, the judge authored an order granting a downward departure and took umbrage with the career guideline application. He also took a very thoughtful and analytical approach to the sentencing issues in the case. However, for comparison to the case at bar, the order does not provide guidance. The defendant in *Newhouse* was a woman whose predicate offenses were an aberration at best because they were both drug crimes that through some quirk of the Iowa state criminal system were charged and sentenced on different days even though they arose on the same day out of the same incident. Further, her federal case, which arose a decade after her state convictions, amounted to her traveling from store to store buying over the counter pseudoephedrine pills to be used in the manufacture of methamphetamine in exchange for which she was provided some of the end product. Moreover, the government agreed that the defendant should be provided with a variance from the career criminal guidelines and filed a motion to reduce the sentence further in exchange for the defendant's

substantial assistance.

In considering the other case authority cited by defendant, there are wide divergent factual variances from the case at bar such that their influence, let alone precedential value, is minimal.

What is clear, as the Court made quite plain at the beginning of the hearing in this case, is that this sentencing court has a great deal of discretion in fashioning a sentence that either accepts or rejects the advice of the Sentencing Commission provided that that sentence has a rational basis, is dependent on relevant factors, well thought out by the Court and reasonable under the circumstances of this case.

The Court believes it is highly probable that the defendant has some mental health issues, but there are no records or other proof other than the assertions of his mother and what one's common sense would infer from what defendant has been through to substantiate it.  In any event it does not provide an excuse for his actions, but based on what is known one can understand some of defendant's behavior.  It will also provide the Court with justification for a special condition of supervised release.

The defendant today is 31 years plus 11 months old.  The essence of his last 17 years and 4 months has been spent committing one crime or another.  However, if the Court only places significant weight, as it suggested it would, on the adult behavior, the time amounts to the last 13 years and 3 months and begins the armed robbery with his uncle, followed by 3 drug crimes.  So for

someone who is almost 32 years old, he is factually a career criminal. This Court has sentenced many defendants, who it has defined as career criminals and who commit crimes so frequently that the label fits, but who did not receive the guideline label of career criminal.

One might read the statute, which mandates the Commission to construct the career criminal guideline, as a directive purely for retribution; its language calls for the Commission to assure that the guidelines specify a term of imprisonment at or near the maximum term authorized for the category of defendants it enumerates. The Commission, however, seems more concerned with reducing the recidivism rate of those at whom this guideline is directed. It has studied the effects of sentences on violent criminals as compared with drug offenders and particularly low level dealers, the type defense counsel suggests Mr. Teague most properly is categorized as, even though Mr. Lee argues vociferously against that for the government.

From the viewpoint of this sentencing judge and I am sure the person upon whom such a sentence is imposed, the career criminal category and the sentence that goes along with it is clearly a great deal of punishment. From the perspective of the judge, it is hoped that deterrence is a by-product.

Frankly, whether a defendant is a guideline career criminal or a career criminal defacto as discussed above doesn't matter in the jurisprudence of today, as the Court must still individualize the sentence in accordance with the facts of the current case. The issue at bar for an individualized sentence is does one who

qualifies as a technical career offender under the guidelines, even if he, at his young age, has not made a legitimate effort to do anything other than engage in criminal activity, deserve the punishment associated with the advice handed down by the Commission reserved for that career criminal label?  Another glimpse at Teague's criminal history is in order.

*Armed robbery.*  He was 17.  His uncle was the one who brandished the gun, gave orders to the victims and grabbed the cash.  The defendant stood watch at the door.

*Unlawful Possession of Crack Cocaine.*  He was 22.  It was found hidden next to the driver's door.  He was also found with hundreds of dollars of cash.  He was not charged with distribution, he denied sales.  It would be this Court's speculation that the drugs and the money were connected.

*Unlawful Delivery of Crack Cocaine.*  He was 26.  Controlled buys by a confidential informant exceeded 10 times.

In this case, the confidential informant made buys of .6 grams.

The Court concludes that the defendant is what is commonly referred to as a street level drug dealer.  One would believe that some judges, for example Judge Adelman or Judge Bennett, may never find it appropriate to sentence a so-called street level drug dealer as a career criminal.  This judge certainly examines each defendant and case on its own merit, believing that the career offender advice and its retribution prescription should be applied in some cases and not in others.  Even street level drug dealers deserve substantial retribution if they insist on

committing such crimes repeatedly, without any apparent end to their lawlessness and little or no respect shown for the law or rights of others.

Defendants who demonstrate a propensity to commit violent acts in support of or associated with their drug crimes certainly seem to be the kind of criminal that Congress intended the Career Criminal tag to target.   Common judicial logic would not vary from that regardless of the presence of a commission to provide advice.

And so when people use violent criminals and major drug dealers in the same sentence are they talking about so-called criminals like Allen Teague who is a repeat street level drug dealer who was 13 years ago convicted of an armed robbery in which he was certainly complicit and guilty, but where his uncle was the gun brandishing codefendant and he was not personally armed.   This defendant does not seem to this Court to be that kind of criminal that people mean to reach when they speak of the violent criminal they intend to protect the public from.

However, one of the troubling aspects of this case is related to the concept of recidivism.   As previously alluded to, the Sentencing Commission has analyzed the value of the career criminal classification regarding its impact on recidivism and its efficacy in protecting the public by getting drug traffickers off the street.

District Judge Adelman referred to this in the case of *United States v. Fernandez* 436 F. Supp. 2d 983 (E.D. Wis. 2006), wherein he quoted the Commission's publication *Fifteen Years of Guideline Sentencing*, pages 133 and

134, published in November of 2004, a publication this defendant relies on for his

argument that this Court should not apply the career offender guideline.   The

pertinent part relied upon by Judge Adelman and defendant Teague, which lays

the foundation for the Court's concern here, is as follows:

> The question for policymakers is whether the career offender
> guideline, especially as it applies to repeat drug traffickers, clearly
> promotes an important purpose of sentencing.  Unlike repeat violent
> offenders, whose incapacitation may protect the public from
> additional crimes by the offender, criminologists and law
> enforcement officials testifying before the Commission have noted
> that retail-level drug traffickers are readily replaced by new drug
> sellers so long as the demand for a drug remains high.
> Incapacitating a low-level drug seller prevents little, if any, drug
> selling; the crime is simply committed by someone else.
>
> Most importantly, preliminary analysis of the recidivism rates of drug
> trafficking offenders sentenced under the career offender guideline
> based on prior drug convictions shows that their rates are much
> lower than other offenders who are assigned to criminal history
> category VI.  The overall rate of recidivism for category VI offenders
> two years after release from prison is 55 percent (USSC, 2004).  The
> rate for offenders qualifying for the career criminal guideline based
> on one or more violent offenses is about 52 percent.  But the rate for
> offenders qualifying only on the basis of prior drug offenses is only
> 27 percent.  The recidivism rate for career offenders more closely
> resembles the rates for offenders in the lower criminal history
> categories in which they *would be* placed under the normal criminal
> history scoring rules in Chapter Four of the *Guidelines Manual.*  The
> career offender guideline thus makes the criminal history category a
> *less* perfect measure of recidivism risk than it would be without the
> inclusion of offenders qualifying only because of prior drug offenses.

As the Court has already noted, it finds the defendant to be a low level drug

trafficker and not the kind of violent offender which the career offender guideline

is seemingly meant to focus its impact upon, as this portion of the Commission's

report suggests policymakers need give careful consideration to.    What is

troubling to the Court is that the defendant has demonstrated an extraordinary rate of recidivism. His recidivism rate with each stint of correctional treatment is 100% and each occasion has been while he is still under some form of sentence, whether probation or parole. This is what led the Court to characterize the defendant as a career criminal by fact. His regular line of work is not one where he leaves homes in the morning, kisses his significant other, pats the kids on the head, grabs his lunch pail and goes off to the job site. He is, on a regular basis, a criminal.

Does that mean that the Sentencing Commission is right and that for this particular individual he should spend somewhere between the next 262 to 327 months, 21.8 to 27.25 years, in prison in order to best serve this factor as well as the factors of deterrence and protecting the public? Had he not been labeled a career offender, even with the Court's finding that he obstructed justice and did not deserve a reduction for acceptance of responsibility, the Commission would be advising the Court to consider a custodial range of 63 to 78 months, 5.25 to 6.5 years. The difference is stunning here in light of the particular convictions on which it is based as well as the relative lack of other criminal history which makes up this defendant's legacy.

In this particular case, the Court cannot accept the advice of the Sentencing Commission. I find that this defendant is not the kind of defendant for which that particularized label is intended to be applied or if he is, the Court rejects that application outright for this particular defendant.

In his crime of violence, though it is properly applied is technical at best, he was not the one who actually perpetrated the violence.  At the age of 17, and given his personal background the Court infers, he was influenced greatly by his uncle who was the perpetrator of the violent acts.   His drug crimes are crimes of possession and low level street trafficking, not what this Court believes is the proper application of the career offender classification without more, in the way of more convictions or more serious additional crimes.   The Court will not, as a consequence, apply the career criminal enhancement from Chapter Four of the Commission's manual to this defendant.

However, considering the Court's complete analysis heretofore, and in particular because of the defendant's recidivism, which the Court has already described sufficiently, I find a sentence at the top end of the previously described guideline range, 78 months, to be appropriate.  The Court finds this sentence will properly account for the seriousness of the instant offense, promote respect for the law in someone who has spent little too little time in each of his prior prison incarcerations, will provide just punishment for his crime while sending an appropriate message of deterrence to the defendant and others, and protect the public.

What it does not do is shelve Mr. Teague away for decades when he is essentially only a low level street dealer of drugs, who this moment, by all accounts, has more likely than not been replaced by someone else in a vicious cycle in a world that has no end in sight of customers and sellers of poison

regardless of its adverse consequences.

What it does not do is presume that just because Mr. Teague barely fits the technical requirements of a career offender label, and even though he only works day in day out as a petty criminal, that the guideline sentence of decades in jail is reasonable for a low level dealer like him. What it does not do is impose a sentence greater than necessary in direct contradiction to the statutory directive to this Court.

Accordingly, it is the judgment of the Court that the defendant, Allen J. Teague, be committed to the custody of the Bureau of Prisons to be imprisoned for a term of 78 months on each of Counts one and two, to be served concurrently.

It is further ordered that the defendant shall pay to the United States a special assessment of $200, payable through the Clerk of the United States District Court.

The Court finds that a fine of $150 per count for a total of $300 as well as the special assessment is in order. The defendant's total financial obligation shall be $500. Clearly the defendant cannot afford a fine within the guideline range, but he must be held accountable and responsible to some financial obligation as part of his supervision. The structure associated with financial obligation will assist the defendant to learn responsibility while demonstrating to him that criminal wrongdoing has financial implications in addition to the loss of liberty.

As for additional statutory factors, the Court has taken into account the

factors of deterrence and protection of the public, which it believes to be relevant and significant. The Court will not repeat again the issue of recidivism here or the need to address it. The Court does not view this sentence as the proverbial slap on the wrist, even though it is strikingly less than the guideline advice of the commission. A 78 month sentence is a significant amount of the loss of anyone's liberty. Any more than that in this case would have been counterproductive in the opinion of this judge and subjected the criminal justice system to arguments that it lacked credibility. Sentencing someone such as this defendant to nearly 200 more months for his type of crime and based on his background may well cause people to reject authority rather than respect it.

The Court will also place the defendant on six years of supervised release, the minimum period of time called for by the statute and, of course, adopted by the Commission in its advice as well. Such an imposition of supervision is appropriate, in particular, with regard to this defendant because of his recidivism and his need for structure, something clearly lacking in his formative years. The term of six years shall be as to both counts one and two and shall run concurrently. Within 72 hours of release from custody of the Bureau of Prisons the defendant shall report in person to the United States Probation Office in the district to which the defendant is released.

While on supervised release the defendant shall be required to follow the standard mandatory conditions of release that have been adopted by this Court and which will be embodied within the written judgment of the Court.

While on supervised release, the defendant shall not commit another federal, state, or local crime.

The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 5 days after being released on supervision and at least two periodic drug tests thereafter, not to exceed 52 tests in a one year period.

The defendant shall not possess a firearm, ammunition or destructive device.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

As for other matters the Court believes certain special conditions are in order while the defendant is on supervised release.

The defendant shall pay any financial penalty that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.  Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be paid in equal monthly installments of $20 or ten percent of his net monthly income, whichever is greater, over a period of 25 months, to commence 30 days after release from imprisonment to a term of supervision.

The defendant shall provide the probation officer and the Financial Litigation Unit of the United States Attorney's Office with access to any requested financial information.  The defendant is advised that the probation office may

share financial information with the Financial Litigation Unit.

The defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and/or any other anticipated or unexpected financial gains to the outstanding court-ordered financial obligation. The defendant shall immediately notify the probation officer of the receipt of any indicated monies.

Clearly, as he has admitted and his history demonstrates, the defendant has a substance abuse problem. The Court will require the defendant to undergo evaluation and treatment under the supervision of the probation office.

Therefore, the defendant shall participate, as directed and approved by the probation officer, in treatment for narcotic addiction, drug dependence, or alcohol dependence, which includes urinalysis and/or other drug detection measures and which may require residence and/or participation in a residential treatment facility, or residential reentry center. The number of drug tests shall not exceed 52 tests in a one year period. Any participation will require complete abstinence from all alcoholic beverages and any other substances for the purpose of intoxication. The defendant shall pay for the costs associated with services rendered, based on a Court approved sliding fee scale as directed by the probation officer. The defendant's financial obligation shall never exceed the total cost of services rendered.

Due to concerns related to the defendant's mental health, the defendant shall participate in a program of mental health treatment, which may include participation in treatment for cognitive skills, anger management or other forms

of therapy or counseling that may be recommended, as directed by the probation officer.    This  may  include  a  mental  health  assessment  and/or  psychiatric evaluation.  This may require participation in a medication regimen prescribed by a licensed practitioner, at the direction of the probation officer.  The defendant shall pay for the costs associated with services rendered, based on a Court approved sliding fee scale as directed by the probation officer.  The defendant's financial obligation shall never exceed the total cost of services rendered.

The defendant has had a significant recidivism issue in the past, including multiple  probation  and  parole  revocations.    In  order  to  provide  adequate opportunities for supervision and an incentive for defendant to resist reoffending, the Court will order a search condition.  Therefore, he shall submit his person, residence, real property, place of business, vehicle, and any other property under his control to a search, conducted by any United States Probation Officer and such  other  law  enforcement  personnel  as  the  probation  officer  may  deem advisable  and  at  the  direction  of  the  United  States  Probation  Officer,  at  a reasonable time and in a reasonable manner, based on a reasonable suspicion of contraband or evidence of a violation of a condition of release, without a warrant. Failure to submit to such a search may be grounds for revocation.  The defendant shall inform any other residents that the premises and other property under the defendant's control may be subject to a search pursuant to this condition.

The  defendant  is  lacking  in  the  skills  necessary  to  find  legitimate employment and so the Court will order he attend a work readiness program

under the supervision of the probation office.  He shall participate in any program deemed appropriate to improve job readiness skills, which may include participation in a Workforce Development Program, as directed by the probation officer.

As the description of this document and the opening paragraph suggest, this is not the final order of the Court, but is the Court's indication of what it intends to impose in its final judgment and order following a period of comments and objections from the parties.  Upon consideration of those comments and objections, should the Court determine that it failed to take any arguments in aggravation or mitigation or some legal requirement into account, it may amend the sentencing indications stated above with full explanation thereof.  The parties have **10 days** from the issuance of this memorandum to file any such objections or comments with the Court.

Signed this 13th day of November, 2013.

Digitally signed by
David R. Herndon
Date: 2013.11.13
14:16:56 -06'00'

**Chief Judge**
**United States District Court**